IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **JOHN MCCROREY,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : |  |
|  | : |  |
| **v.** | : | **No. 22-02227** |
|  | : |  |
|  | : |  |
| **CITY OF PHILADELPHIA,** | : |  |
| *Defendant.* | : |  |

**MEMORANDUM**

Kenney, J.                                                                                          July 26, 2023

Plaintiff John McCrorey ("Plaintiff") brings this action against Defendant City of Philadelphia ("Defendant") alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). Presently before this Court is Defendant's Motion for Summary Judgment (ECF No. 25), which has been fully briefed (ECF Nos. 30, 34). For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment (ECF No. 25). An appropriate Order will follow.

**I.      FACTUAL BACKGROUND**

Plaintiff John McCrorey was an officer of the Philadelphia Police Department from 1982 until his retirement in 2021. ECF No. 1 ¶¶ 21, 38, 53. In 2014, Plaintiff was assigned as a lieutenant and supervisor in the Narcotics Field Unit ("NFU"). *Id.* ¶¶ 27, 29; ECF No. 31 ¶ 27. Plaintiff remained in the NFU until his retirement in 2021. ECF No. 31 ¶¶ 101, 108, 116.

1

The NFU is a part of the Narcotics Division of the Narcotics Bureau, the branch of the Philadelphia Police Department responsible for enforcement of drug laws. *Id.* ¶ 9–10; ECF No. 1 ¶ 29. Specifically, the NFU is a "plainclothes, investigative unit of the Philadelphia Police Department that investigates drug crime or sales occurring indoors at properties with the goal of serving warrants for drugs and other contraband." ECF No. 31 ¶ 12. The NFU is divided into six squads covering six divisions across the City of Philadelphia: South, Southwest, Central, North, Northeast, and East Divisions. *Id.* ¶ 13. Plaintiff was assigned to the NFU squad covering the East Division ("East Squad"), which includes the neighborhood of Kensington, home to "the largest open-air drug market on the East Coast of the United States." *Id.* ¶¶ 14, 27. Prior to September 2020, NFU squads were generally comprised of one lieutenant, one sergeant, and multiple officers. *Id.* ¶ 16. Each lieutenant was supposed to report to Captain David Merrick. *Id.*

In July 2020, Christopher Flacco became the Chief Inspector of the Narcotics Bureau. *Id.* ¶ 1. Flacco testified that prior to his appointment, Deputy Commissioner Singleton, who informed Flacco of his appointment, told Flacco to "do what [he has] to do to fix [the Narcotics Bureau] and get it working." *Id.* ¶ 2. Since June 2019, the size of the Narcotics Bureau has declined due to attrition and retirements. *Id.* ¶ 23. The manpower for the NFU also decreased during this time, which, according to Flacco, forced the NFU to disband one of its two East Division squads. *Id.* ¶ 24; ECF No. 27 ¶ 2. Flacco also testified that, upon his appointment, Philadelphia City Council members voiced a desire for an improved narcotics enforcement strategy in Kensington, and that Flacco was thus directed to submit "a detailed plan of narcotics enforcement for the East Division" to the Philadelphia Police Commissioner's Office. ECF No. 31 ¶ 75.

Before his assignment to the Narcotics Bureau, Flacco served as the Chief Inspector of the Office of Professional Responsibility. *Id.* ¶ 3. Flacco testified that as a result of Internal Affairs

investigations conducted during his time in this role, he "was well aware of the lieutenants assigned to the Narcotics Bureau, their strengths, their weaknesses, the complaints that were put against them," and that he "had a pretty . . . good picture of the entire Narcotics Bureau and how it operated." *Id.* ¶¶ 4–5. Flacco testified further that with this background, he was "not impressed with the Narcotics Bureau as a whole," including its personnel, with only a few exceptions. *Id.* ¶ 6. According to Flacco, Plaintiff was not one of these exceptions, whereas Lieutenant Marques Newsome was. ECF No. 25-4 at 19.

Inspector Jamill Taylor, the supervisor of the Narcotics Division, testified that, upon arriving to the Bureau, Flacco evaluated the Bureau for a roughly two-month period to understand its operations. ECF No. 31 ¶¶ 10, 76. Following this period, Flacco proposed a plan, the Narcotics Enforcement Strategy ("NES"), on September 28, 2020. *Id.* ¶ 77. In the accompanying NES Memo, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Additionally, an "enhanced NFU squad . . . would be created within the Narcotics Bureau to address the NES in [East Police Division ("EPD")] with officers selected based on a number of criteria. ECF No. 27 ¶ 4.

At the time of Flacco's appointment to the NFU, Plaintiff was irrevocably scheduled to retire pursuant to the Deferred Retirement Option Program ("DROP") on October 23, 2021. ECF No. 31 ¶ 28. The DROP program is designed to assist the City with succession planning by

"[allowing] the city to know exactly when individuals are retiring, and which positions will need to be backfilled." *Id.* ¶ 133. To this end, the DROP program enables employees with City-issued pensions to commit to a retirement date four years in advance and collect both their salaries and pension payments during their final years in service. *Id.* ¶ 134. To be eligible for the DROP program, an officer must be eligible for retirement. *Id.* ¶ 135.

Plaintiff alleges that at a September 22, 2020 supervisor's meeting, Flacco "commented on how old the supervisors and personnel assigned to the unit [were]" and asked who was in the DROP program. ECF No. 1 ¶¶ 32, 36. Plaintiff alleges that this was not the first time that Flacco asked which members of the unit were DROP participants. ECF No. 34 ¶¶ 203–04. Plaintiff also alleges that, in reference to NFU personnel working protests in the city, Flacco stated, "we are out of the protest business" and "the police force [does not need] a bunch of fifty-year-old cops in uniform acting as an [Emergency Response Group]." ECF No. 1 ¶¶ 33–34. When asked who was in the DROP program, Plaintiff, along with Sergeant James Schuck and Lieutenant Robert Muldoon, raised his hand. *Id.* ¶ 37. Plaintiff alleges that Flacco then introduced his plan for an additional squad of three supervisors and twenty police officers to be formed in conjunction with the NES plan as the enhanced NFU squad in the East Division. *Id.* ¶ 39. At the same meeting, Flacco then selected Lieutenant Marques Newsome, Sergeant Vincent Nowakowski, and Sergeant Alonzo Jett, all in their forties, for the three supervisor positions, with the two sergeants reporting to Newsome. *Id.* ¶ 40; ECF No. 31 ¶¶ 103, 197.

As part of this reorganization, Flacco removed Plaintiff's entire squad, all over 50 years old, from the East Division, and reassigned Plaintiff, then 61 years old, to the Northwest Squad, still part of the NFU. ECF No. 1 ¶¶ 20, 31, 44; ECF No. 31 ¶¶ 101, 105. While Plaintiff's base salary did not change with this reassignment, Plaintiff contends that the East Squad had

significantly more opportunities for overtime than other squads "one, on the basis of the scope and area of the investigations, as well as the more people you're supervising, the more investigations are going to open, the more investigative overtime is going to be generated." ECF No. 31 ¶¶ 104, 106. Plaintiff also contends that "assignment to the revised East squad carried a certain amount of prestige and was perceived as favorable." ECF No. 30-1 at 7. Additionally, Plaintiff believes that the East Squad was "innovative, desirable, and esteemed," and that "supervising and being part of a new, advanced drug enforcement approach from the start up would give Plaintiff more visibility and boost his career." *Id.* at 5–6.

Plaintiff attributed his being moved off of the East Division to his age and DROP status, while Flacco testified that the decision was driven by a recognition of Lieutenant Newsome's qualifications for the position, not a desire to move Plaintiff off of the East Division. ECF No. 31 ¶¶ 89–90, 92–95, 107. Flacco also testified that Newsome was recommended for the position by Inspector Taylor. *Id.* ¶ 89. Comparing career advancement and pay opportunities in the East Squad to those of the Northwest Squad, Flacco testified that Plaintiff's reassignment was "to a different squad with the same exact responsibilities just in a different geographic part of the city," a characterization which Plaintiff disputes because of alleged differences in prestige and potential for overtime. *Id.* ¶¶ 102, 104; ECF No. 30-1 at 5–7. Plaintiff did not ask Flacco or Taylor if he could remain in the East Squad, nor did Plaintiff ask why he was reorganized to the Northwest Squad. ECF No. 31 ¶ 98.

Captain Merrick testified that he disagreed with Flacco's decision to appoint Newsome to the East Squad because Newsome lacked established relationships in the region. ECF No. 34 ¶ 181. Merrick also testified that Plaintiff previously ran the East Squad efficiently and was "overall [Merrick's] best lieutenant." *Id.* ¶ 180. Merrick testified further that Flacco's "reasoning [for the

reassignments] was basically he wanted to have particular lieutenants that were of a younger age in particular groups, and he kind of made the lieutenants that were older aware that they really weren't going to be included in his plans going forward." ECF No. 30-3 at 61.

Following Plaintiff's reassignment, Plaintiff went out on sick leave and began "running time," the practice of using accrued balances when nearing retirement, on September 23, 2020. ECF No. 31 ¶¶ 108–09. Plaintiff never reported to assume command of Northwest Squad and never returned to work. *Id.* ¶¶ 108, 116. Prior to going on leave, Plaintiff told Captain Merrick that he could not "deal with this guy upstairs and with everything [Plaintiff] has going on." *Id.* ¶ 115. Plaintiff also told Merrick that he was "going to get a doctor's note and [he] was going to start running time, and [he was] just going to go ahead on and retire." *Id.* At this time, Plaintiff's brother-in-law recently passed away and Plaintiff's son was in and out of the hospital and severely ill. *Id.* ¶¶ 113–14. During his time on leave, Plaintiff presented sick notes to the Police Department on October 5, 2020, December 2, 2020, January 15, 2021, February 15, 2021, and March 25, 2021. *Id.* ¶ 118. The first sick note alluded to "medical reasons," while the other four were attributed to "reported anxiety." ECF No. 25-4 at 176–80.

While on leave, on February 23, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant alleging age discrimination. ECF No. 1 ¶ 50. Flacco testified that he learned of Plaintiff's EEOC complaint when he was interviewed by the Employee Response Unit, some period after the initial complaint was filed. ECF No. 31 ¶ 132.

Also while on leave, on July 9, 2021, Plaintiff submitted a DROP extension election form. *Id.* ¶ 148. "The Philadelphia Code includes provisions which allow, under extraordinary circumstances, an extension in the DROP retirement program for up to one additional year." ECF

No. 25-4 at 226. Lieutenant James Ferguson, who served as administrative supervisor for Deputy Commissioner of Organizational Services Christine Coulter and was responsible for reviewing DROP extension applications, testified that extensions were approved to get "boots on the ground" due to staffing shortages. ECF No. 31 ¶¶ 137–38, 140. On July 2, 2021, the Mayor of Philadelphia authorized a one-time DROP extension for officers who were scheduled to retire on a DROP date falling within July 1, 2021 through June 30, 2022. *Id.* ¶ 142. The Mayor authorized this extension in response to crime levels, political unrest, the COVID-19 pandemic, and staffing needs. ECF No. 25-4 at 226.

Lieutenant Ferguson testified that in order to be eligible for the DROP extension, an employee had to be physically working or able to work. ECF No. 31 ¶ 147. The 2021-2022 DROP Extension FAQ document states that "sworn officers of the Police Department at the rank of Police Officer I or above who [were] required to separate from City employment between July 1, 2021 and June 30, 2022 as a result of their entry into the [DROP program] [were] eligible for this DROP extension." ECF No. 25-4 at 181. The FAQ also includes the question, "What happens if I am injured or become ill and need more time off?" *Id.* at 183. The answer states that "in order to serve the extraordinary circumstances that make this DROP extension necessary, it is essential that [the applicant] be able and available for work." *Id.* The answer states further, "If it is determined that [the applicant] [is] unable to perform the essential functions of the job, with or without reasonable accommodation, [the applicant's] participation in the DROP extension will end and [the applicant] will be separated from employment." *Id.*

The DROP extension election form submitted by Plaintiff on July 9, 2021, explains that the purpose of the DROP extension is to enhance the uniformed staffing strength due to existing levels of crime and as a result of large-scale events that are expected. ECF No. 31 ¶ 148. The form

further states that an individual must be able and available for work during the duration of the DROP extension period. *Id.* Although Plaintiff read the form before he signed it, and agreed to what was in it, at the time he signed it, he did not have a return to work date from any of his doctors. *Id.* ¶ 149.

Lieutenant Ferguson testified that the Deputy Commissioner had ultimate decision-making authority on DROP extensions "if there were questions regarding [an applicant's] status," and that decisions were made based on the totality of the circumstances. *Id.* ¶ 150. Ferguson was responsible for compiling information on DROP extension applicants and sending that information to the Deputy Commissioner. *Id.* ¶ 151. When Ferguson received the list of individuals who applied for the DROP extension, he would: first, ask the Police Department Safety Office their duty status and second, would personally run each name through the daily attendance reporting ("DAR") system. *Id.* ¶ 152. When Ferguson ran a DAR report for Plaintiff, the DAR system, which retained attendance information back roughly one and a half years, reflected that Plaintiff had been out on sick leave for the duration of the period run through the system. *Id.* ¶ 153.

On July 27, 2021, Plaintiff received a letter denying his DROP extension. *Id.* ¶ 156. The letter states that "extending employees must be able and available to work for the duration for he [sic] extended DROP period." ECF No. 25-4 at 190. The letter states further that "[t]he individual facts and circumstances of [Plaintiff's] work status [had] been reviewed and it [had] been determined that [he was] not currently able or available to work. As such, [he was] not eligible for the DROP extension authorized by Mayor Kenney." *Id.*

Despite being out on leave for months and receiving this letter, Plaintiff believes that he was denied a DROP extension because he claims he received a phone call from an unidentified individual saying that Flacco was going to try and deny his and Lieutenant Muldoon's DROP

extensions. ECF No. 31 ¶ 157. The caller was neither Flacco nor Taylor. *Id.* Notably, Lieutenant Muldoon's DROP extension was approved and he remained working in the NFU. *Id.* ¶ 158. In total, four individuals were denied DROP extensions during this period, two, including Plaintiff, were out on extended sick leave, and the other two were "out injured on duty." *Id.* ¶ 160. Ferguson testified that no officers that were out on extended sick, vacation, or injury leave were granted a DROP extension in fiscal year 2022. ECF No. 25-4 at 204. Ferguson also testified that he was not aware of Plaintiff's EEOC complaint at the time of the DROP extension denial. ECF No. 31 ¶ 162. Flacco testified that he had no part in the DROP extension denial as "[i]t has nothing to do with the bureau chiefs or the chain of command of the individual officer," and that he was not even aware of Plaintiff's DROP extension request. *Id.* ¶ 163. None of the individuals involved with the DROP extension decision reported to Flacco or fell within the groups that had access to EEOC complaints. *Id.* ¶ 164.

Pursuant to his original DROP date, Plaintiff retired on October 23, 2021. *Id.* ¶ 165.

## II. **PROCEDURAL HISTORY**

On June 6, 2022, Plaintiff filed this Complaint against the City of Philadelphia alleging age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). ECF No. 1. On March 29, 2023, Defendant moved for summary judgment on the grounds that Plaintiff's age discrimination and retaliation claims both fail as a matter of law. ECF No. 25-2 at 2. Plaintiff filed a Response in Opposition on April 19, 2023 (ECF No. 30), and Defendant filed a Reply on April 26, 2023 (ECF No. 34). The Court held oral argument on May 16, 2023. ECF No. 36.

III.   **STANDARD OF REVIEW**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Indeed, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also* Fed. R. Civ. P. 56(c).

The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. The non-movant opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d

965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## IV.   <u>DISCUSSION</u>

Defendant argues that they are entitled to summary judgment on Plaintiff's age discrimination claim because (1) Plaintiff cannot establish a *prima facie* case of age discrimination; and (2) Defendant had legitimate, nondiscriminatory reasons for the East Squad supervisor decision. Defendant also argues for summary judgment on Plaintiff's retaliation claim because (1) Plaintiff cannot prove a *prima facie* case of retaliation under the ADEA or the PHRA; (2) Plaintiff cannot establish a pattern of antagonism because he never returned to work; and (3) Defendant had legitimate, non-retaliatory reasons for deeming Plaintiff ineligible for a DROP extension.

In response, Plaintiff argues that (1) summary judgment on the age discrimination claim should be denied because Defendant's explanation for its actions were pretext for its discrimination in violation of the ADEA and PHRA; and (2) summary judgment on the retaliation claim should be denied because Plaintiff engaged in protected conduct under the ADEA and PHRA, and his DROP extension denial in conjunction with discriminatory treatment establish causation.

As set forth below, the Court finds that (1) Plaintiff's age discrimination claim fails because Plaintiff fails to establish a genuine issue of material fact that his transfer constituted an adverse employment action; and (2) Plaintiff's retaliation claim fails because Plaintiff fails to establish a genuine issue of material fact that his DROP extension denial constituted an adverse employment action, and that his EEOC complaint caused the DROP extension denial. Accordingly, Defendant is entitled to summary judgment.

A.     Age Discrimination Claim

The ADEA makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1).

In their Motion for Summary Judgment, Defendant contends, *inter alia*, that there is no direct evidence of age-based discrimination and, accordingly, Plaintiff's claims should be evaluated under the three-step burden shifting inquiry from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–03 (1973). ECF No. 25-2 at 8. As there is no evidence that would prove age discrimination "without inference or presumption," the Court agrees that the burden shifting inquiry is the appropriate test. *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (citations omitted).

"The *McDonnell Douglas* framework requires that the plaintiff first establish a *prima facie* case of discrimination or retaliation. If the plaintiff successfully meets the requirements of a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions. If the employer produces such a reason, the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–04).

"The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the Court." *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003). First, to establish a *prima facie* case of age discrimination under either the ADEA or PHRA, Plaintiff must establish that he: (1) is forty years of age or older; (2) was subject to an adverse employment action; (3) was qualified for the position in question; and (4) was replaced by another employee who was sufficiently younger to support an inference of discrimination. *Torre*, 42 F.3d at 830. "Where the plaintiff is not directly replaced, the fourth element is satisfied if the plaintiff can provide facts which 'if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)).

There is no dispute that Plaintiff satisfies the first and third prongs of a *prima facie* case of age discrimination—Plaintiff is over forty years of age and was qualified to be a lieutenant in the NFU's East Squad. *Torre*, 42 F.3d at 830; ECF No. 25-2 at 9. However, as set forth below, Plaintiff fails to establish a genuine issue of material fact as to the second prong—*i.e.*, that he suffered an adverse employment action. *Torre*, 42 F.3d at 830. Because Plaintiff was not subject to an adverse

13

employment action, the Court will not address the fourth element of the *prima facie* age discrimination case, whether the circumstances of Plaintiff's transfer support an inference of discrimination. *Id*. Additionally, because Plaintiff fails to establish a *prima facie* case of age discrimination, the Court will not address further burden shifting under the *McDonnell Douglas* framework. *Tourtellotte*, 636 F. App'x at 842.

An "adverse employment action" has been defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 518 (E.D. Pa. 2012). Outside of employment actions with direct and immediate economic consequences, employment actions that impede professional growth or significantly disrupt working conditions may also be adverse. *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir. 1999); *Walker v. Centocor Ortho Biotech, Inc.*, 558 Fed. App'x 216, 219 (3d Cir. 2014).

"Employment actions such as lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions." *Walker*, 558 Fed. App'x at 219 (citing *Burlington Indus.*, 524 U.S. at 761). For lateral transfers to qualify as adverse employment actions, the transfer must generally lead to a change in "pay, benefits, duties, prestige," or rank. *Id.*; *see also Rosati v. Colello*, 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015) (finding no adverse employment action where officer was reassigned to different platoon in same district with same schedule and accommodations). As noted in *Burlington*, inconveniences and "bruised ego[s]" have been deemed insufficient to categorize transfers as adverse employment actions. *Burlington Indus.*, 524 U.S. at 761. An employee's subjective preference for one position does not, absent additional facts, make the employee's assignment to another position an adverse

employment action. *Swain v. City of Vineland*, 457 Fed. App'x 107, 110–11 (3d Cir. 2012). Rather, there must be some indication that the preferred position's responsibilities are "objectively better (*e.g.*, more prestigious or less burdensome)," than those of the less preferred position. *Id.* (holding that employee's preference for K-9 unit, which he considered a "specialized endeavor," absent material difference in compensation, terms, conditions, privileges, prestige, or responsibilities, was not sufficient to create adverse employment action when officer was not assigned to that unit). Additionally, "a speculative increase in potential overtime does not qualify as a change in the terms or conditions of employment, particularly where one's current position . . . offers its own opportunities to earn overtime." *Id.* at 111.

The Third Circuit has not provided specific guidance on analyzing differences in prestige, however courts in other jurisdictions have looked for objective factors to substantiate the notoriously subjective measure of "standing or estimation in the eyes of people." *Freeman v. Potter*, 200 Fed. App'x 439, 444–45 (6th Cir. 2006) (citation omitted). Factors examined have included a role's associated level of responsibility, unique characteristics, and training or educational requirements. *Id.* (citing *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004)). Tangible effects on career advancement have also been analyzed. *See Bryson v. Chicago State University*, 96 F.3d 912, 916 (7th Cir. 1996) (finding that title stripped from professor "conferred prestige and was important to further professional advancement" as it communicated professor's qualifications to other academics). Additionally, courts have looked for some showing that the employee's target position was *more* prestigious than the employee's less-preferred position. *See Freeman*, 200 Fed. App'x at 445 (holding that conclusory evidence regarding differences in relative prestige between positions was insufficient to support contention of prestige-based adverse employment action). Prestige has also been distinguished from

desirability, which alone may or may not be sufficient to create an actionable claim of adverse employment action. *Compare id.* (holding that although preferred position may have been more desirable because located in university town with "ready access to collegiate athletic events, arts, community lectures, etc., . . . simply because a position is desirable to someone does not make the failure to get it actionable"), *with Torre*, 42 F.3d 825 at 831 n. 7 (finding plaintiff "created a material fact issue concerning whether he was transferred . . . to a dead-end job that had effectively been eliminated before he was transferred to it," even though no difference in pay or benefits), *and Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 115 (3d Cir. 1996) (finding officer's claim that road patrol assignment was less desirable than detective bureau was sufficient to overcome summary judgment even without cut in pay or rank).

In the present case, Plaintiff's reassignment from the East Squad to the Northwest Squad resulted in no direct, immediate economic harm as Plaintiff remained a lieutenant in the NFU and retained the same base compensation. ECF No. 31 ¶¶ 102, 104. Plaintiff contends that his responsibilities would have changed with his reassignment to the Northwest Squad, but provides no evidence demonstrating how his duties would have actually differed. *Id.* ¶ 86. Rather, Plaintiff bases his theory of adverse employment action on two separate contentions: (1) that the Northwest Squad offered "significantly" less opportunities for earning overtime than the East Squad; and (2) that the Northwest Squad was perceived as less prestigious than the East Squad and offered less opportunities for visibility that could "boost [Plaintiff's] career." ECF No. 31 ¶ 106; ECF No. 30-1 at 5–7. For the reasons set forth below, the Court finds both arguments are insufficient to establish an adverse employment action.

For Plaintiff's overtime contention, Plaintiff argues that the East Squad offered more opportunities for overtime "on the basis of the scope and area of the investigations" and because

"the more people you're supervising, the more investigations are going to open, the more investigative overtime is going to be generated." ECF No. 31 ¶¶ 104, 106. This contention fails to rise beyond speculation. *See Swain*, 457 Fed. App'x at 111. As in *Swain*, Plaintiff asserts that there would be a discrepancy in overtime between the two positions but provides only vague assumptions to support his assertion. *Id.*; ECF No. 31 ¶¶ 104, 106. The Northwest Squad was not without opportunities for overtime, and Plaintiff fails to present facts establishing that the overtime opportunities in the Northwest Squad were inferior to those of the East Squad. ECF No. 31 ¶¶ 104, 106.

Plaintiff's prestige contention is similarly unpersuasive. Although Flacco's NES Memo indicates that consideration for the revamped East Squad did require certain qualifications, Plaintiff provided no evidence demonstrating that the position entailed unique responsibilities or characteristics that could have a bearing on career advancement. ECF No. 27 ¶ 4; ECF No. 30-1 at 5–7. Plaintiff's belief that the revamped East Squad was "innovative, desirable, and esteemed" is remarkably similar to the officer's belief in *Swain* that the K-9 unit was a "specialized endeavor." *See Swain*, 457 Fed. App'x at 110–11; ECF No. 30-1 at 5–7. In this case, as in *Swain*, the preferred position confers no advantage in compensation, terms, conditions, privileges, or responsibilities. *See Swain*, 457 Fed. App'x at 110–11; ECF No. 30-1 at 5–7. Additionally, prestige is generally evaluated through the lens of career advancement, but Plaintiff was already enrolled in the DROP program and scheduled to retire in 2021. *See Bryson*, 96 F.3d at 916; ECF No. 31 ¶ 28. Thus, even if supervising the revamped East Squad would have signified to others in the Police Department that Plaintiff was doing a certain kind of "innovative" police work, the assignment still would have no bearing on Plaintiff's career advancement since his retirement was imminent. *See Bryson*, 96 F.3d at 916; ECF No. 31 ¶ 28. Plaintiff also offers no characterization of the Northwest Squad's

prestige relative to that of the East Squad. *See Freeman*, 200 Fed. App'x at 445; ECF No. 30-1 at 5–7.

Ultimately, Plaintiff's theory of adverse employment action comes down not to prestige, but desirability. *See Freeman*, 200 Fed. App'x at 445; *but see Torre*, 42 F.3d 825 at 831 n.7, *and Hampton*, 98 F.3d at 115. Plaintiff, a veteran officer approaching retirement, wished to stay in the East Division with "[his] guys." ECF No. 31 ¶ 107. While Plaintiff's distress at his unexpected transfer so close to retirement is understandable, the Court finds no tangible impact of the transfer beyond loss of desirability. *See Freeman*, 200 Fed. App'x at 445; ECF No. 31 ¶ 107.

*Muldoon v. City of Philadelphia* and *Schuck v. City of Philadelphia*, the sister cases to this case initiated by Lieutenant Robert Muldoon and Sergeant James Schuck, respectively, denied defense motions for summary judgment finding sufficient evidence of adverse employment action by relying on the holdings in *Torre* and *Hampton* concerning desirability. *Muldoon v. City of Philadelphia*, No. 22-1929, 2023 WL 2789692, at *1 (E.D. Pa. Apr. 5, 2023); *Schuck v. City of Philadelphia*, No. 2:22-cv-02124, 2023 WL 3393416, at *2 n.3 (E.D. Pa. May 11, 2023). The Court finds these cases distinguishable. In *Torre*, the plaintiff was terminated after being transferred to what he viewed as a "dead-end job" that allowed for his termination to come at a "more propitious—and seemingly innocent—moment." *Torre*, 42 F.3d at 827–28. Here, Plaintiff was not terminated and his transfer was from one of the NFU's six geographic regions to another, far from a "dead-end job" but rather integral to the operations of the NFU as a whole. *See id.* In *Hampton*, the plaintiff was transferred from the detective bureau to a substantively different role in road patrol which he viewed as less desirable. *Hampton*, 98 F.3d at 111, 116. Here, Plaintiff was transferred to a role in the same division with the same general duties, greatly distinguishable from a move from detective work to road patrol. *See id.* Additionally, if the plaintiff in *Hampton*

viewed the road patrol assignment as less desirable *because* it was less prestigious, then this would be a prestige-based argument which Plaintiff fails to establish. *See id.* For these reasons, the Court finds any loss in desirability as a result of Plaintiff's transfer insufficient to classify the transfer as an adverse employment action.

Accordingly, even taking the facts and inferences in the light most favorable to Plaintiff as the non-moving party, Plaintiff has failed to meet his burden to show a *prima facie* case of age discrimination.

B.   Retaliation Claim

Plaintiff also brings claims of retaliation pursuant to the ADEA and PHRA. Once again, since there is no direct evidence of retaliation, the Court uses the burden shifting framework in *McDonnell Douglas*. "[A] plaintiff asserting a retaliation claim first must establish a *prima facie* case by showing (1) [that he engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (internal citations omitted). There is no dispute that Plaintiff's EEOC Complaint, filed February 23, 2021, constituted protected employee activity. However, for the reasons set forth below, Plaintiff fails to establish a genuine issue of material fact either that (1) he was subject to an adverse employment action contemporaneous with or following his EEOC complaint; or (2) his EEOC complaint caused the adverse employment action, if found. Again, because Plaintiff fails to establish a *prima facie* case of retaliation, the Court will not address further burden shifting under the *McDonnell Douglas* framework. *Tourtellotte*, 636 F. App'x at 842.

1.     Adverse Employment Action

To determine whether an employee was subject to an adverse employment action in response to or during the protected activity, the Court "examine[s] the challenged conduct from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Daniels*, 776 F.3d at 195 (internal citations and quotation marks omitted). "[P]laintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* The spectrum of employer actions that may be categorized as adverse is also broader in retaliation claims than discrimination claims. *See Komis v. Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 293 (3d Cir. 2019) (stating that "[u]nlike the antidiscrimination provision, the antiretaliation provision is not limited to employer action that affects the terms and conditions of a claimant's employment").

Here, while not dispositive, the denial of Plaintiff's DROP extension application did not seriously alter Plaintiff's compensation, terms, conditions, or privileges of employment. *Id.* If Plaintiff sincerely believed that he was entitled to the DROP extension as a privilege of his employment, that belief was not reasonable. *Daniels*, 776 F.3d at 195. Plaintiff harbored no illusions as to the function of the DROP program, testifying, "[Y]ou sign a contract with the City saying that on that date you have to retire." ECF No. 31 ¶ 38. Far from guaranteed, DROP extensions are allowed under the Philadelphia Code only for "extraordinary circumstances." ECF No. 25-4 at 226. The Mayor declared such an extraordinary circumstance authorizing DROP extensions on July 2, 2021, "as a result of the level of shootings, political unrest, and economic circumstances faced by the City as it [recovered] from the COVID-19 pandemic, and existing and projected staffing levels within the key departments in the City, that threatens public health, safety, and welfare." *Id.* Even when DROP extensions are formally authorized, individual approval is

20

clearly limited based on ability to work. *Id.* at 183, 186. The DROP Extension FAQ makes clear that "it is essential that [the applicant] be able and available for work." *Id.* at 183. Plaintiff's DROP Extension Election Form states, "I affirm that I am currently able to perform the essential functions of my position . . . I also understand that . . . I must be able and available for work for the duration of the extended DROP period." *Id.* at 186.

Plaintiff contends that the Election Form only conveys that applicants must be available to work during the extended period, not also during the period leading up to the original DROP date. ECF No. 30-1 at 16. This is a mischaracterization of the document. *Id.* Plaintiff affirmed that he was currently able to work, but never returned to work or provided a doctor's note indicating that he could return. ECF No. 31 ¶¶ 148–49. In a police force combating attrition and personnel shortages, the DROP program, and by extension, the DROP extension program, exist to facilitate personnel planning and keep "boots on the ground." *Id.* ¶¶ 23, 133, 140. Granting a DROP extension to an officer who is out sick and running time with no timetable for return would contravene this purpose. *Id.* Accordingly, the only four DROP extensions denied during this period were for individuals that were out on extended leave. *Id.* ¶ 160.

Taking all facts in the light most favorable to Plaintiff, Plaintiff still fails to establish that a reasonable employee would have found the DROP extension denial materially adverse. *Daniels*, 776 F.3d at 195. Plaintiff was not entitled to a DROP extension merely on account of his enrollment in the DROP program, and indeed he was not qualified for the extension given his prolonged absence from work. *Id.* A reasonable employee would not be dissuaded from engaging in protected conduct for fear of being denied something they had no chance of being granted in the first place, and as such the Court finds no evidence that Plaintiff was subject to an adverse employment action in response to his EEOC complaint. *Id.*

2.      Causal Connection Between Protected Act and Adverse Action

Even if the DROP extension denial constituted an adverse employment action, Plaintiff fails to raise a genuine issue of material fact that his EEOC complaint caused the denial. To prove causation in this context, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Burton v. Pennsylvania State Police*, 990 F. Supp. 2d 478, 509 (M.D. Pa. 2014) (citing *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)), *aff'd*, 612 F. App'x 124 (3d Cir. 2015). Courts "consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." *Daniels*, 776 F.3d at 196 (internal citations omitted). "To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually suggestive.'" *Id.* (internal citations omitted). "In the absence of such a close temporal proximity, [courts] consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Id.* (internal citations omitted). Intervening antagonism by an employer may create an inference of causation where the plaintiff offers "circumstantial evidence of a 'pattern of antagonism' following the protected conduct." *Bailey v. Commerce Nat. Ins. Servs., Inc.*, 267 F. App'x 167, 170 (3d Cir. 2008) (citing *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)). "The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels*, 776 F.3d at 196–97 (internal citations omitted).

Here, roughly five months[1] passed between Plaintiff's EEOC complaint, filed February 23, 2021, and Plaintiff's receipt of the DROP extension denial letter, dated July 27, 2021. ECF No. 1 ¶ 50; ECF No. 31 ¶ 156. In *Williams v. Philadelphia Housing Authority Police Dept.*, the Third Circuit found that an elapsed period of two months between a protected activity and adverse employment action was "not so close as to be unduly suggestive." 380 F.3d 751, 760 (3d Cir. 2004) (citations omitted). Similarly, in *LeBoon v. Lancaster Jewish Community Center Ass'n*, the Third Circuit found that "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." 503 F.3d 217, 233 (3d Cir. 2007) (citations omitted). In *Bailey*, the Third Circuit similarly found that an elapsed period of four months was not unduly suggestive. 267 F. App'x at 170 (citations omitted). With these decisions in mind, the Court finds that the elapsed five month period is not unduly suggestive of retaliatory motive.

Plaintiff also offers insufficient evidence to establish that he experienced a pattern of antagonism. In *Robinson v. Southeastern Pennsylvania Transp. Authority, Red Arrow Div.*, the Third Circuit found a pattern of antagonism where the employer "subjected [plaintiff] to a constant barrage of written and verbal warnings . . ., inaccurate [disciplinary] point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial [protected conduct] and continued until his discharge" 982 F.2d 892, 895–96 (3d Cir. 1993) (internal quotation marks

---

[1]     Defendant's Motion for Summary Judgment cited ten months between the protected activity and DROP extension denial. ECF No. 25-2 at 20. Rather than use Plaintiff's EEOC complaint as the protected conduct, this calculation appears to use the date Plaintiff went on leave, September 23, 2020. ECF No. 31 ¶¶ 108–09, 156. As Plaintiff only alleges retaliation in response to the EEOC complaint, the Court will use the date the EEOC complaint was filed, February 23, 2021.

omitted). Given this pattern, "the court could reasonably find that the initial series of events [surrounding the protected conduct] thus caused [plaintiff's] and [defendant's] relationship to deteriorate." *Id.* Here, there is no such pattern as Plaintiff was permitted to continue running time up to his DROP date without ever being subjected to any kind of disciplinary action or other form of antagonism. ECF No. 31 ¶¶ 108–109, 116. A single call from an unidentified individual stating that Flacco would try to deny Plaintiff's and Muldoon's DROP extensions is at most an isolated occurrence that fails to establish a pattern indicative of retaliatory cause. *Id.* ¶¶ 157–58.

Perhaps most importantly, Plaintiff fails to establish that any of the decisionmakers behind the DROP extension denial were aware of Plaintiff's EEOC complaint at the time of the decision, a showing that *Daniels* instructs is essential to establishing causation. *Daniels*, 776 F.3d at 196–97. None of the individuals involved with the DROP extension decision reported to Flacco or fell within the groups that had access to EEOC complaints. ECF No. 31 ¶ 164. Even if Flacco was aware of Plaintiff's EEOC complaint prior to the DROP extension decision, Lieutenant Ferguson, who was responsible for reviewing the extension applications, testified that he was not aware of the complaint, and nothing in the record indicates otherwise. *Id.* ¶ 162. Plaintiff also provides no evidence that Christine Coulter, Deputy Commissioner of Organizational Services, was aware of the complaint. *Id.* ¶ 137. Additionally, the phone call from an unidentified individual fails to rise beyond hearsay. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (noting that "hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment") (internal citation omitted).

For these reasons, even taking the facts and inferences in the light most favorable to Plaintiff as the non-moving party, Plaintiff has failed to establish that his EEOC complaint was the "but-for cause" of the DROP extension denial. *Burton*, 990 F. Supp. 2d at 509. Far from

establishing the protected conduct as a but-for cause of the denial, Plaintiff has not even established that the protected conduct was a contributing cause. *Id.* Plaintiff was out on leave with no timetable for return and denied the ability to extend his participation in a program designed to facilitate personnel planning and keep "boots on the ground." ECF No. 31 ¶¶ 23, 133, 140. Four officers were denied DROP extensions, and all four were out on extended leave. *Id.* ¶ 160. Conversely, Lieutenant Muldoon, who also filed an EEOC complaint but, unlike Plaintiff, remained at work, was granted a DROP extension. *Id.* ¶ 158; *Muldoon*, 2023 WL 2789692, at *1. As such, Plaintiff's prolonged absence from work is the only apparent cause of his DROP extension denial, and Plaintiff has not provided sufficient evidence to establish even a tenuous causal link tracking the decision back to his EEOC complaint.

## V.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 25) is granted, and judgment is entered in favor of Defendant. An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney
_____

CHAD F. KENNEY, JUDGE